UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JOYCE F. HENDERSON,        )
        Plaintiff,        )
                   )
   vs.             )       1:01-cv-286-LJM-JMS
                   )
MICHAEL J. ASTRUE, Commissioner of  )
Social Security,        )
        Defendant.       )

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Joyce F. Henderson ("Henderson"), requests judicial review of the final decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration (the "Commissioner"), who found that Henderson was not entitled to a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI"). The Court rules as follows.

## I. BACKGROUND

### A. PROCEDURAL HISTORY

Henderson first applied for DIB on July 10, 1998, and SSI on March 17, 1999. R. at 67, 250. She did not appeal her initial denials but refiled for DIB and SSI on January 14, 1999, alleging the same onset date. R. at 70, 253. Henderson's second applications were denied initially, on reconsideration, and by Administrative Law Judge Manuel Carde ("ALJ Carde") after a hearing. R. at 19, 49, 54, 56, 292, 711. ALJ Carde considered the case de novo and on March 24, 2000, found that Henderson was not disabled. R. at 19, 392. ALJ

Carde's decision became the final decision of the Agency when the Appeals Council denied review.  R. at 10.

Henderson then commenced a civil action in this Court, seeking judicial review of the Agency's final decision.  R. at 711.  This Court ordered that the case be remanded to the Agency for further proceedings.  R. at 711.  A new administrative hearing was held before ALJ Carde, and on March 26, 2004, ALJ Carde issued a decision that Henderson was not disabled.  R. at 711, 949.

In the interim, Henderson filed DIB and SSI applications in May 2000.  R. at 415, 711.  Those applications were denied initially, on reconsideration, and by ALJ Harold E. Atherly ("ALJ Atherly") after a hearing.  R. at 353, 367, 410, 711.  ALJ Atherly's October 19, 2001, decision became the final decision of the Agency when the Appeals Council denied review.  R. at 344, 711.  Henderson commenced another civil action in this Court, seeking judicial review of the Agency's final decision.  R. at 711.  This Court ordered that the case be remanded to the Agency for further proceedings.  *Id.*  On July 27, 2004, Henderson filed another application for SSI, which was denied initially and on reconsideration.  R. at 711, 754, 758, 778.  On January 27, 2005, Henderson filed a request for a hearing.  *Id.*

Administrative Law Judge James R. Norris ("ALJ Norris") consolidated both of Henderson's applications and held a new administrative hearing on August 8, 2005.  R. at 995.  After this hearing, ALJ Norris denied her applications for SSI and DIB, and Henderson sought review from this Court.

### B.  MEDICAL HISTORY

Henderson was born on December 19, 1965.  R at 70.  Henderson was twenty-seven years old when she developed recurrent lower back pain that radiated down her hip

to her left leg.  R. at 135, 202, 211.  From December 1994 to January 1998, Dr. Gregory French ("Dr. French") intermittently treated Henderson for lower back pain, which he diagnosed as lumbosacral spine pain syndrome in February 1994 and thoracic spondylosis[1] in March 1996.  R. at 152-53, 165, 166-67, 170, 173-74, 202.  From March 1995 through July 1997, Dr. Timothy Dick ("Dr. Dick") treated Henderson for hand and arm pain caused by bilateral carpal tunnel syndrome, bilateral cubital tunnel syndrome, and right flexor tenosynovitis/tendinitis.  R. at 429-30, 461-567, 485, 490, 507, 546.  Henderson underwent right elbow ulnar nerve transposition, left cubital tunnel release, and bilateral carpal tunnel syndrome release.  R. at 521, 549.  Dr. Dick last treated Henderson on July 30, 1997, for complaints of palmer soreness and volar wrist pain, which he diagnosed as bilateral flexor tenosynovitis with evidence of clinically recurrent neuropathy[2].  R. at 567.

From December 1997 to January 1998, Dr. French continued to treat Joyce's back and assessed her with muscle spasms, right leg weakness, and lumbosacral tenderness. R. at 153.  In April 1998, Henderson reported that she gained thirty to forty pounds over the previous three months.   R. at 202.  X-rays taken on April 22, 1998, showed mild spondylosis (osteoarthritis) at L5-S1.  R. at 203.  From April to September 1998, Dr. Don Jardine ("Dr. Jardine") treated Henderson for lower back pain with left leg radiculopathy[3]. R. at 206-211.  In May 1998, she complained of gripping and pulling sensations down her

---

[1] "Spondylosis" is defined as "any lesion of the spine of a degenerative nature." STEDMAN'S MEDICAL DICTIONARY 1656 (26th Ed. 1995) ("STEDMAN'S").

[2] "Neuropathy" is defined as "a disease involving the cranial nerves, or the peripheral or autonomic nervous systems."  STEDMAN'S, at 1204.

[3] "Radiculopathy" is defined as a "[d]isorder of the spinal nerve roots." STEDMAN'S, at 1484.

3

left leg and had paraspinous spasms and a sway back.  R. at 210.  She reported that she

was unable to walk or stand for long periods of time.  *Id.*  Her gait pattern was slow and

cautious.  *Id.*  Dr. Jardine submitted disability papers to Meijer, her employer at the time.

*Id.*

On June 15, 1998, after Dr. Jardine treated her for a couple months, Henderson was

involved in a car accident and went to Methodist emergency room with chest, shoulder, and

cervical pain.  R. at 191-96, 209.  She was diagnosed with acute cervical and lumbar

strains.  *Id.*  Henderson returned to Dr. Jardine the next month with complaints of worsened

pain since her car accident.  R. at 207-08.  She had a headache and a shocking pain that

radiated from her neck to her left shoulder and down her arm to her fingers.  *Id.*  She had

shooting pains from her left buttock to her left thigh.  R. at 207-209.  She felt that she lost

strength in both her upper and lower extremities.  *Id.*  She still had lower back pain and left

buttock pain that radiated from her midline lower back slightly to the left and down her left

leg.  *Id.*  Sitting sometimes relieved her pain.  *Id.*  Other times she had to lie down.  *Id.*  She

could not sit at the beauty parlor due to back pain.  R. at 207.  Objectively, Dr. Jardine

identified loss of left grip strength, muscle spasms, L5-S1 tenderness, positive left straight

leg raise, trigger points in her left lumbosacral area and left sacroiliac joint, and reduced

range of motion.  R. at 206-208.  Lumbosacral x-rays revealed mild spondylosis.  R. at 203.

In August 1998, Henderson had a "clearly positive" Patrick's test[4] on the left side,

and Dr. Ghetan Shukla ("Dr. Shukla") administered trigger point injections and a sacroiliac

_____

[4] A "Patrick's test" "determine[s] the presence or absence of sacroiliac disease."
STEDMAN'S, at 1782.

joint injection.  R. at 183-84.  After receiving the injections, Henderson left the clinic on crutches and could not walk for the next four days.  R. at 206-7.

On October 15, 1998, SSA consultative examiner ("CE") Dr. Thabet Al-Sheikh ("Dr. Al-Sheikh") evaluated Henderson and observed that she walked with a mild limp and had mild difficulty walking on her heels and toes.  R. at 212-14.  At the time, Henderson weighed 200 pounds and was sixty-one inches tall.  *Id.*  Her activity was limited to walking half a block, occasionally assisted by crutches or a cane.  *Id.*  Dr. Al-Sheikh noted that an MRI revealed mild diffuse disc bulging at L4-5 and central focal disc bulging at L5-S1. R. at 213.  An x-ray showed mild spondylosis.  *Id.*  Dr. Al-Sheikh opined that Henderson had chronic lower back pain, mostly musculoskeletal in origin, and did not evidence physical signs of radiculopathy. R. at 212-13.  Wishard primary care physician Dr. Suzanne Wilson ("Dr. Wilson") also examined Henderson for the first time in October 1998.  R. at 237-46.  Dr. Wilson observed that Henderson's left leg was numb and weak.  R. at 241. On October 19, 1998, a State Agency physician opined that Henderson was limited to light work.  R. at 230.

In December 1998, Henderson had left lateral knee pain with movement.  R. at 241. She weighed 209 pounds.  R. at 240.  By February 1999, Henderson's weight had increased to 211.5 pounds and her back pain radiated to her toes.  R. at 225, 239.  Her pain still improved when lying down.  R. at 239.  Dr. Wilson diagnosed heel spurs and a herniated disc, based on Henderson's pain in the S1 dermatome, and prescribed Flexeril, Vicodin, Naprosyn, and heel cups.  R. at 593, 239.

When Dr. Al-Sheikh performed a second CE exam on February 27, 1999, Henderson reported that her pain progressively worsened.  R. at 225.  Her lower back pain

radiated down both legs to her feet. *Id.* She could tandem walk only while holding on to the examination table. *Id.* Her lumbar back was tender to palpation and her active range of motion was limited secondary to pain. *Id.* The sensation on the bottoms of her feet was decreased bilaterally. R. at 226. She had a weak left grip of four out of five due to wrist pain with mild left wrist tenderness and normal manipulative abilities. R. at 226. Dr. Al-Sheikh observed that Henderson had,

> [c]urrent low back pain that is worrisome for being secondary to radiculopathy in light of progressive worsening, radiation of the pain and the reported subjective sensory deficit on the bottom of both feet, which might respond with the S-1 distribution but [is] suspicious because the claimant has symmetric ankle jerks bilaterally. Review of the relevant imaging studies, including an MRI, and even a repeat MRI might be indicated to rule out any significant abnormalities not evident on physical exam.

R. at 227.

In March 1999, Henderson underwent physical therapy ("PT") at Wishard's American Back Pain Center ("Pain Center") to decrease her back pain and increase her sitting tolerance. R. at 587-91. She complained that she had difficulty with any prolonged activity and was unable to find a position that decreased her symptoms. R. at 268-69. Sitting, standing, rising, bending, and walking all increased her pain. *Id.* She could sit ten minutes, stand five to ten minutes, and walk ten minutes. *Id.* She reported that the pain in her left foot was nine on a ten scale when standing, and the pain in her right foot was seven on a ten scale when standing. R. at 269. Her therapist was unable to find a position or movement that decreased her distal symptoms. R. at 591. Her therapist prescribed a home exercise program and educated Henderson on posture and symptom monitoring as well as activities of daily living ("ADL") and workplace modifications. R. at 268. Henderson returned to the Pain Center on April 1, 1999. R. at 238. At that time, she weighed 217

pounds.  R. at 238.  Henderson reported episodes where her legs gave out bilaterally.  R. at 265.  Her therapist instructed her not to bend while bathing, to avoid making beds, and to rest over the weekend.  R. at 265.  After four PT sessions, Henderson did not report significant changes in her symptoms, nor was she compliant with the program.  R. at 263. On April 5, 1999, Henderson again reported to Dr. Wilson that her legs had given out twice. R. at 238.  Dr. Wilson assessed that her left knee reflex was depressed as compared to her right.  *Id.*  A lumbar MRI on April 16, 1999, showed degenerative disease of the lower lumbar spine with moderate central canal stenosis[5] that worsened at L4-L5.  R. at 244.  X-rays showed significant joint space narrowing at L5-S1.  R. at 238.  On March 17, 1999, and June 10, 1999, State Agency physicians opined Henderson could perform light work. R. at 230.

In June 1999, the Wishard neurosurgery clinic ("Neuro Clinic") evaluated Henderson's lower back pain, right leg collapse, and increased weakness on the left.  R. at 583.  She experienced decreased light touch on the left as compared to the right.  *Id.* The Neuro Clinic recommended weight loss and analgesics.  R. at 583.  Dr. Wilson noted that Henderson's lumbar area was tender to touch and she revealed a diminished right knee reflex.  R. at 243.  Her left leg strength decreased to four and a half out of five.  R. at 586.  Serology testing was abnormal with a 1:40 ANA titer and an ANA RXN in a speckled pattern.   R. at 243, 571.   Dr. Wilson prescribed Flexeril, Naprosyn, Vicodin, and Cyclobenzaprine for pain management.  *Id.*

---

[5] Central Canal "Stenosis" is "a narrowing" of the spinal cord.  STEDMAN'S, at 265, 1673.

In July 1999, Jennifer Callaghan ("Callaghan"), Henderson's case manager at the Family Investment Center ("Center"), wrote a letter advising that Henderson was enroled in the Center's Self-Sufficiency Program.  R. at 262.  Callaghan explained that she was in the process of helping Henderson relocate to an apartment without stairs due to Henderson's extreme difficulty navigating the stairs in her two-story apartment.  *Id.*  Calahan had several opportunities to visit Henderson at home and witness her limited capacities first-hand.  *Id.*  According to Callaghan, Henderson was frequently forced to stay in her upstairs bedroom because she was unable to climb the stairs.  *Id.*  On one occasion, Henderson was unable to get out of her bathtub due to extreme back pain.  *Id.*  Callaghan also reported that Henderson received orders from her physician to maintain strict physical limitations, including:  avoid stairs, excessive walking, bending, squatting, and reaching above her shoulders; lift no more than five pounds; and limit housework.  R. at 262.

On September 14, 1999, Dr. Wilson reported that Henderson had lumbar back pain, decreased knee reflexes, decreased strength at L3 and L4, and leg pain due to back osteoarthritis and spinal stenosis.  R. at 276-79.  Henderson's medications included Vicodin and Naprosyn.  *Id.*  Dr. Wilson opined that in an eight-hour workday, Henderson could sit two hours and stand less than two hours; frequently lift less than 10 pounds and occasionally lift 10 pounds; and use her arms for reaching half the time she was on the job.  *Id.*  Dr. Wilson thought cold and humid conditions would exacerbate Henderson's osteoarthritis and opined that Henderson required a job that allowed her to change positions from sitting to standing and also allowed her to walk around at will.  *Id.*  She predicted that Henderson would probably need to change positions at least four to six times daily, with ten minute breaks before returning to work.  *Id.*  Dr. Wilson also opined that

8

Henderson could only stoop or crouch 10% of the day and that cold temperatures and humid conditions would exacerbate her arthritis. *Id.* Dr. Wilson further opined that Henderson's symptoms were often severe enough to interfere with her concentration but noted that pain medication could sedate her and cloud her thinking. *Id.* Dr. Wilson anticipated that Henderson would be absent from work, on average, twice monthly. *Id.*

Henderson continued to complain of lower back and leg pain throughout the next year. R. at 573, 581-586, 618. In July 2000, she was diagnosed at the Neuro Clinic with a mild right S1 radiculopathy based on MRI findings of a right-sided herniated disc at L5-S1. R. at 573, 618. She complained of bilateral lower extremity pain; left worse than right, and paresthesia[6] of both feet. R. at 616, 618. The pain on her left side extended from her hip to just below her knee. R. at 616, 618. She had difficulty with toe lifts, left greater than right, and had decreased pin prick sensation at the dorsum of the left foot. R. at 616, 618. Her legs gave out intermittently. R. at 616, 618. Despite her progressing neurological deficits, the Neuro Clinic concluded that Henderson was not yet a surgical candidate. R. at 616, 618.

In July 2000, Dr. Ray Henderson ("Dr. Ray") performed a SSA CE and reported that Henderson had diffuse degenerative arthritis, mild CTS, and morbid obesity. R. at 596. She complained of some paresthesia in her hands and her range of motion was restricted in the dorsolumbar spine and knees. R. at 595-96. She had a left antalgic[7] gait and station

---

[6] "Paresthesia" is "[a]n abnormal sensation, such as of burning, pricking, tickling, or tingling." STEDMAN'S, at 1300.

[7] An "analgesic" response is a "reduced response to painful stimuli." STEDMAN'S, at 69. Thus, an antalgic gait is a limp adopted to avoid pain. *Id.*

with difficulty performing tandem walking maneuvers.  *Id.*  She was unable to balance on one foot and had moderate difficulty ascending to the examining table.  *Id.*  She weighed 233 pounds with a body mass index exceeding forty.  R. at 595-96.

Dr. Wilson again identified decreased right knee reflexes in August 2000. R. at 677. In October 2000, doctors at the Neuro Clinic diagnosed Henderson with mechanical lower back pain and advised her to consider a plated fusion at L5-S1.  R. at 608.  A back brace ("TLSO") and a discogram were ordered.  R. at 608.  She obtained some relief from the TLSO,  but still reported pain that radiated down her right leg.  R. at 665.  The Neuro Clinic revised her diagnosis to include right L5 radiculopathy and advised her to continue using the brace.  R. at 665.  Shortly thereafter, the Neuro Clinic advised Henderson to undergo surgery.  R. at 663.  She agreed and surgery was planned for January 2001.  R. at 663. In November 2000, Dr. Wilson advised the State Agency that Henderson had a chronic condition of spinal stenosis for which she was taking Vicodin.  R. at 633.  Henderson could not lift weights over ten pounds and squatting and bending were very difficult for her. R. at 633.  By January 2001, a neurological assessment showed unequal reflexes in Henderson's lower extremities and diminished pinprick sensation of the right leg.  R. at 644. Her symptoms increased with activity.  *Id.*  She reported using a cane three to four times a week outside of the home.  *Id.*  Pain shot down both legs to her toes.  *Id.*  An MRI and x-ray revealed a L5-S1 disc bulge with severe bilateral neuroforaminal narrowing.  R. at 644.

On February 21, 2001, Henderson underwent spinal fusion surgery with plates and internal fixation at L4-5, followed by inpatient PT.  R. at 640-43, 647.  Her right leg pain resolved within a month after surgery, but she continued to have central lower back pain that radiated over her tail bone past her left knee with numbness laterally on her left side

from her hip to her ankle and some weakness in both legs.  R. at 647.  She was diagnosed with mild left post operative L5 radiculopathy, likely related to screw placement, and was advised to wait for six months post-surgery to have the left-side hardware removed.  R. at 647.  Henderson's left ankle strength was three out of five and the neurological status of her left hip and knee was slightly diminished.  R. at 640, 652-53.  She was discharged from PT on April 23, 2001, with instructions not to bend, lift, or twist.  R. at 635.

Goals of reducing her pain to one or two out of ten were not achieved.  R. at 635.  Henderson complained of right knee and bilateral leg pain in May and June 2001.  R. at 638.  She weighed almost 260 pounds.  *Id.*  Light touch remained diminished at her left foot and calf.  R. at 636-38.  Her Neurontin dosage was increased.  R. at 636, 638.

In August 2001, Henderson presented with a right-side headache that had lasted two or three weeks and was different from her previous migraines.  R. at 1179.  She had been taking Maxalt for her migraines.  *Id.*  In September 2001, a Wishard doctor opined that Henderson could sit for eight hours with frequent breaks or stand or walk for four hours.  R. at 682.  He also opined that she could frequently lift and/or carry twenty pounds and occasionally lift twenty-five pounds.  *Id.*  She could use her hands for simple grasping, fine manipulation, and pushing or pulling.  *Id.*  She could push and pull with her feet.  *Id.*  She could not bend, squat, or crawl.  R. at 683.  She could occasionally climb and could frequently reach.  *Id.*  At her September 2001 hearing, before ALJ Atherly, Henderson testified that she had pain twenty-four hours a day.  R. at 386.  Her hands were weak and she dropped things.  R. at 373.  She wore a back brace every day and spent the majority of her days in her bedroom laying down or sitting up.  R. at 374, 382.  She explained that

11

her medications made her sleepy.  R. at 381.  She reported falling several times due to weakness in her legs.  R. at 384.  Henderson's sister, Cynthia Evans, testified that she performed the majority of Henderson's housework and cooking because Henderson could not do it for herself.  R. at 387-390.  ALJ Atherly concluded that Henderson was not disabled, in part, because she was able to perform her past relevant work ("PRW").  R. at 360-61.

In October 2001, Henderson reported bilateral hip and knee pain.  R. at 1204.  She was also diagnosed with depression and poor sleep.  *Id.*  In December 2001, Henderson reported renewed pain and more left-side symptoms.  R. at 1187-88.  She exhibited decreased strength and sensation on the left and favored her left leg.  *Id.*  A December 2001 radiology test documented mild effacement of the L5 nerve root on the right.  R. at 1186.  A CT myelogram[8] showed a disc bulge at L4-5 with mild impingement of the L5 nerve root to the right.  *Id.*  In January 2002, Henderson reported recurring back pain with decreased strength in her left lower extremity.  R. at 1182, 1185.  She was referred to the pain clinic and placed on Amitriptyline.  *Id.*  In May 2002, Henderson reported that she continued to have lower back pain.  R. at 1176.  She had an antalgic gait but her strength was normal.  *Id.*  She was discharged from the pain clinic and ordered to rest for three days.  *Id.*  In July 2002, Henderson was examined for a two week exacerbation of her lower back pain.  R. at 1171-2.  She was unable to rest adequately because she was preparing for her wedding that Saturday.  *Id.*  She was referred to the pain clinic but did not attend.  R. at 1179.  Henderson was also examined for continued lower back and left leg

---

[8] A "myelogram" is a "[r]adiographic contrast study of the spinal subarachnoid space and its contents."  STEDMAN'S, at 1165.

pain in April 2003.  R. at 1142.  She was not exercising due to pain but wanted to lose weight.  *Id.*  Her goal was a hundred pound weight loss over two years.  *Id.*  Her Vicodin prescription was continued and she was also prescribed Valium for spasms.  *Id.*  In April 2003, Henderson complained of chest pain and tightness and, in June 2003, she underwent a stress test.  R. at 1131-34, 1140, 872.  The stress test was submaximal at 3.6 METS, indicating poor exercise tolerance.  *Id.*  Henderson developed chest tightness and moderate dyspnea during testing that resolved quickly with rest, but her hemodynamic[9] response to exercise was normal.  *Id.*  Her ejection fraction was 53% and she weighed 252 pounds, representing a three pound weight loss.  R. at 898-900.  In May 2003, Henderson attended PT for her back pain.  R. at 1127.  In July 2003, Henderson reported that she was using Vicodin twice daily for back pain of eight out of ten.  R. at 871.  In August 2003, Henderson reported that her asthma was worse at night.  R. at 1224.  She also complained of choking when she tried to swallow solid food.  *Id.*  An August 25, 2003, lumbar MRI revealed a new right L4-5 posterolateral herniated disc and degenerative changes, which partially occluded the right L4-5 intervertebral foramen, causing some right L5 compression/stenosis.  R. at 897, 869.  In September 2003, Henderson reported that although her back pain improved after surgery, it began bothering her again over the past year.  R. at 867-69.  She took two to three Vicodin a day for intermittent, sharp, shooting lower back pain with bilateral leg pain and numbness that was eight on a scale of ten.  *Id.*  She had decreased light touch in the left lower extremity, bilateral hip pain, and bilateral arm/shoulder pain and weakness.  *Id.*  Her pain increased when walking and subsided

---

[9] "Relating to the physical aspects of the blood circulation."  STEDMAN'S, at 777.

13

when sitting.  *Id.*  She experienced some relief from the numbness in both her lower extremities by elevating her legs.  *Id.*  Selective nerve blocks were prescribed but Henderson was afraid to go to the pain clinic.  *Id.*  The symptoms from her herniated disc were controlled.  *Id.*  Henderson reported bilateral hip pain in October 2003.  R. at 1218. She again explained that she was afraid to go to the pain clinic.  *Id.*  She was also having some problems with her asthma.  *Id.*  It was noted that she had a herniated disc with controlled symptoms.  *Id.*

In December 2003, Henderson reported to the Neuro Clinic that her back pain was worse than her leg pain and that her left leg pain was worse than her right leg pain.  R. at 866.  She took four to six Vicodin a day for pain of eight on a scale of ten.  *Id.*  She had mild decrease light touch of her left lower foot, shin, and anterior thigh.  *Id.*  The Neuro Clinic observed that Henderson's lower back pain was unlikely to benefit from her size and did not correspond well with her MRI findings.  *Id.*  She was referred to the pain clinic.  R. at 866.  A few weeks later Henderson's back condition was stable, but her pain remained eight to nine on a scale of ten.  R. at 865.  In July 2004, Henderson complained of right shoulder pain and a four-day migraine headache.  R. at 861.  She advised her doctors that she was ready to go to the pain clinic.  *Id.*  In August 2004, Henderson reported to the SSA that she had migraine headaches two to three times a week, sometimes twice a day, that lasted at least five hours.  R. at 816.  When she developed a headache, Henderson took her migraine medication and laid down in the dark with no noise and no visitors.  *Id.*  She experienced nausea and did not have an appetite.  *Id.*  She could not get up and get dressed like she would on a normal day.  *Id.*

14

In September 2004, Henderson reported that she was achy and tired with pain of four on a scale of ten, but that her back was "OK."  R. at 919.  She reported to Dr. Iyas Yousef ("Dr. Yousef") at a September 2004 CE that she had almost constant back pain, which was located mainly at the central part of her lower back.  R. at 856.  She also reported radiation to both lower extremities with more radiation to her left than to her right.  *Id.*  She described bilateral leg numbness to her feet.  *Id.*  Her discomfort was exacerbated by exertion, sitting, standing, reaching, and bending over.  *Id.*  Vicodin relieved her syptoms.  *Id.*  Henderson could only walk a half block, lift five pounds, sit twenty minutes, and stand for ten minutes at a time.  *Id.*  Her gait was wide due to her weight.  R. at 858.  She had minimal difficulty walking on heels and toes or tandem walking.  *Id.*  She had limited range of motion in her lower spine and knees.  *Id.*  Bending her knees hurt her back.  *Id.*  Her handgrip was weaker bilaterally.  *Id.*  She stated that she could perform fine finger manipulation, but it took longer.  *Id.*

In October 2004, Henderson reported that she spent the majority of her time resting because she could not walk.  R. at 809.  She needed assistance to cook, clean, bathe, and dress.  *Id.*  By November 2004, her back pain was six to seven on a scale of ten.  R. at 912.  She also experienced numbness and tingling in both legs.  *Id.*  Her back was nontender but her straight leg raise was negative.  *Id.*  She indicated that she was ready to consider surgery.  *Id.*  When Henderson returned to the Neuro Clinic in January 2005, she reported progressively worse lower back pain and left radicular pain over the preceding six months.  R. at 908-09.  She also noticed left hemifacial and hemibody decreased sensation and weakness during the previous eight months.  *Id.*  She demonstrated decreased strength and sensation on the left side of her body with a positive straight leg raise on the left.  *Id.*

15

Her pain was eight on a scale of ten. *Id.* Brain, cervical, and lumbar spine MRIs were ordered. *Id.*

In January 2005, Henderson reported that, over the previous six months, she experienced increased lower back and left radicular pain. R. at 909. Pain in her lower back radiated down her left leg below the knee and she had tingling along her left lateral thigh. *Id.* She noticed left hemifacial and hemibody decreased sensation and weakness during the previous eight months. *Id.* She was taking six Vicodin a day. R. at 908-09. Her symptoms progressively worsened over the previous six months and were exacerbated by walking. *Id.* She could only walk half of a block. *Id.* She had decreased strength and sensation on her left side. *Id.* She had decreased sensation from L1 to L3 on the left and a positive left straight leg raise. *Id.* In February 2005, Henderson reported continued decreased sensation on her left side. R. at 904. Her pain was eight on a scale of ten. *Id.* Her back pain was "pretty stable," although she had to occasionally increase her Vicodin dosage. *Id.*

In March 2005, a lumbar MRI showed L4-5 anterior central epidural soft tissue, which enhanced consistently with granulation tissue and disc bulging with facet hypertrophy. R. at 930. There was stable, moderate foraminal stenosis bilaterally. *Id.* At L5-S1, where the fusion was performed, an epidural enhancing scar surrounded the thecal sac and bilateral S1 transversing roots. *Id.* An MRI of the cervical spine showed moderate degenerative changes of the cervical spine with multiple areas of central canal stenosis, which was worse at C3-4 and C6-7 and caused mild cord deformity without abnormal cord signal. R. at 940. There was a small central/left paracentral disc osteophyte complex at C2-3, effacing the CFS space and flattening the left anterior aspect of the spinal cord. *Id.*

16

At C3-4, a significant central disc protrusion impinged and deformed the ventral spinal cord and moderately narrowed the central spinal canal.  *Id.*  Mild neural foraminal narrowing was also present bilaterally.  *Id.*  At C4-5, a small disc/osteophyte complex flattened the ventral spinal cord.  *Id.*  At C5-6, there was left greater than right disc osteophyte complex, which flattened the ventral spinal cord on the left.  *Id.*  At C6-7, there was a left greater than right disc osteophyte complex, which impinged on the left ventral aspect of the spinal cord with moderate central stenosis.  R. at 940**.**  An MRI of the brain was unremarkable.  R. at 1097. Henderson demonstrated left upper and lower extremity weakness on exam and her doctor noted there was spinal stenosis at L4-5 on the lumbar MRI.  R. at 938.

On March 16, 2005, Henderson complained of right-sided pain at her lateral thigh and calf.  R. at 939.  The pain subsided when she leaned forward.  *Id.*  She experienced numbness in her left face and left arm.  *Id.*  However, there was no Babinski[10], clonus[11], or Hoffman's[12] sign.  *Id.*  She had decreased strength and sensation on her left side.  *Id.*  Her pain was seven on a scale of ten.  *Id.*  Henderson complained of light-headedness and visual hallucinations in April 2005.  R. at 933-35.  She admitted that she was depressed and had a migraine before the hallucinations started.  *Id.*  Her lower back pain was seven on a scale of ten.  *Id.*  Henderson's hallucinations ceased, but later that month she

---

[10] A positive Babinski's sign indicates "extension of the great toe and abduction of the other toes instead of the normal flexion reflex to plantar stimulation[.]"  STEDMAN'S, at 1614.

[11] "A form of movement marked by contractions and relaxations of a muscle, occurring in rapid succession seen with, among other conditions, spasticity and some seizure disorders."  STEDMAN'S, at 354.

[12] "[I]n latent tetany mild mechanical stimulation of the trigeminal nerve causes severe pain."  STEDMAN'S, at 1617.

experienced additional episodes of dizziness and headaches.  R. at 931.  A brain MRI was negative, but a lower back MRI revealed moderate degenerative disc disease of the cervical spine.  *Id.*  Henderson's doctor at the Neuro Clinic opined that she may need additional surgery.  *Id.*

In May 2005, an extension/flexion x-ray showed a 10% translation of L4 on L5 during extension, which increased to 20% during flexion.  R. at 1116.  Henderson complained of right thigh and calf pain, numbness and weakness of the left side, and lower back pain that radiated down her legs to the front of her foot; left greater than right.  R. at 1114.  She also complained of difficulty finding words to express herself.  *Id.*  She did not report neck pain.  *Id.*  It was noted that an MRI showed L4-5 stenosis.  *Id.*  Her light touch was diminished in her left face, arm, trunk, and leg.  *Id.*  Her arm reflexes were asymmetrical.  *Id.*  Her doctor opined that she may need an L4-5 decompression.  *Id.*

In July 2005, Dr. Cynthia McGarvey ("Dr. McGarvey") evaluated Henderson's left side weakness.  R. at 1106, 1108-09.  Henderson complained of pain in her back and bilateral legs with numbness and tingling that radiated down her leg.  *Id.*  She walked with a limp and felt like her back was tight.  *Id.*  Her pain increased when she walked.  *Id.*  She experienced constant numbness and tingling in her left face, arm, and leg and intermittent numbness and tingling in her right leg.  *Id.*  She was occasionally constipated and felt like she had to go to the bathroom quite a bit.  *Id.*  The only tests noted by Dr. McGarvey were Henderson's brain CT and MRI and lower back MRIs.  *Id.*  She had decreased sensation on the left face.  *Id.*  She had full right side strength, but her left side strength ranged from four plus to three.  *Id.*  It seemed more give-way than organic.  *Id.*  Her sensation was decreased throughout the left side.  *Id.*  Her left Achilles reflex was absent.  *Id.*  Dr.

18

McGarvey concluded that Henderson's examination revealed no specific focal deficits and was either subjective or fluctuating. *Id.* Dr. McGarvey did not believe that the etiology was an infarct or a peripheral nerve problem. *Id.*

In August 2005, Henderson reported that her back and both legs had been hurting for six months; prior to that, her back and left leg hurt. R. at 1124. Her left arm and leg felt "different." *Id.* She had difficulty walking. *Id.* The left side of her body felt numb. *Id.* She complained of constipation and increased urinary frequency. *Id.* She displayed weakness of her left upper extremity and right lower extremity. *Id.* She had positive bilateral straight leg raises. *Id.* She experienced diminished left side sensation. *Id.* The evaluating physician opined that her paresthesia and weakness were questionable because they were all subjective. *Id.* There was a note to consider incorporating L4-5 into Henderson's existing fusion; however, it was important to completely rule out any pathology of the left-side paresthesia. *Id.* The evaluating physician also opined that Henderson needed an MRI of the cervical spine and that, if the cervical MRI was negative, Henderson would be reevaluated for a L4-5 fusion. *Id.*

## C. PROCEDURAL HISTORY

At the time of ALJ Norris' decision Henderson was forty-one years old. R. at 708. She completed high school with a GED and has past relevant work as a retail store clerk at Meijer's. R. at 1033. She claims she became disabled on March 3, 1998, due to degenerative disc disease and carpal tunnel syndrome ("CTS"). R. at 67, 70, 103, 253, 711.

At her August 8, 2005, hearing before ALJ Norris, Henderson appeared with counsel. *Id.* Nina Smith, M.D. ("Dr. Smith"), testified as an expert in internal medicine. R.

at 1034-37.   Richard Hutson, M.D. ("Dr. Hutson"),   testified as an orthopedist medical expert.  R. at 1037-49.  Ray Burger ("Burger") testified as a vocational expert ("VE").   R. at 1032-34, 49-50.  Henderson testified that she still dropped things with both hands and could hardly lift anything with either arm.  R. at 1001.  She experienced cramping in both her hands and her arms.  R. at 1000.  She felt aching, numbness, and tingling sensations from her elbows to her shoulders and from her wrists to the tips of her fingers.  R. at 1002-03.  She also testified that the symptoms she experienced in her right arm were worse than in her left.  R. at 1001.  She experienced some relief after her February 2001 surgery (R. at 1006), but still experienced severe back pain and numbness and tingling in her legs and feet.  R. at 1003, -08-09.  In addition, Henderson reported that her medications, especially Vicodin and Neurontin, made her very drowsy.  R. at 1010.  She testified that she suffered from migraine headaches two times a week, which she treated with medication and sleep in a dark, quite room.  R. at 1024-25.

Dr. Smith testified that Henderson has hypertension, Graves' disease[13], and mild asthma.  R. at 1034-35.  According to Dr. Smith, the symptoms Henderson experiences from hypertension and Graves' disease would not, by themselves, impart any limitations or restrictions.  R. at 1034.  The symptoms Henderson experiences from asthma could be limited by avoiding concentrated fumes, gases, and cold temperatures.  R. at 1035.  Dr. Smith also noted that Henderson testified she experienced migraine headaches.  R. at 1035.  Dr. Smith testified that the record revealed Henderson had intermittently been prescribed Midrin for her migraine headaches.  *Id.*  Dr. Smith did not find any other

---

[13] "[T]hyroid dysfunction and all or any of its clinical associations[.]"  STEDMAN'S, at 497.

information in the record regarding the severity of Henderson's migraines or how often they occur. *Id.*

Dr. Hutson noted Henderson's testimony regarding the problems she experienced in her hands and arms. R. at 1037-38. Dr. Hutson testified that the objective medical evidence revealed that Dr. Dick performed surgery on Henderson in September 1996, to remove pressure from her ulnar nerve. R. at 1038. Dr. Hutson also noted that, according to Dr. Dick's follow-up examination of Henderson, the problem was resolved. *Id.* In addition, Dr. Hutson noted that in April 1997, Dr. Dick performed left cubital tunnel and carpal tunnel release. *Id.* Then, in May 1997, Dr. Dick advised Henderson to return to her normal work. *Id.* Dr. Hutson also noted that in July 2000, Dr. Henderson reported that Henderson was neurologically intact. *Id.*

In addition, Dr. Hutson noted that the record revealed Henderson had back surgery at L5-S1 in February 2001. R. at 1038. He also stated that the March 7, 2005, MRI of Henderson's cervical spine showed moderate degenerative disc disease with multiple central canal stenosis, worse at C3-4 and C6-7, causing mild spinal cord deformity without abnormal cord signal change. R. at 1047. In addition, Dr. Hutson observed that Henderson's recent medical exams have prompted her doctors to consider increasing her fusion at the L4-S5 level. R. at 1039. However, he also testified that the objective medical evidence revealed Henderson does not have a neuro-anatomical loss of neurological function in either her upper or lower extremities. R. at 1040. In addition, Dr. Hutson reviewed the report from Dr. Wilson and noted that there is no indication that Henderson has a cervical abnormality, which would give rise to overhead restrictions. R. at 1042.

Dr. Hutson opined that the medical evidence of record supported restrictions of sedentary work with a sit/stand option of five minutes per hour, not to leave the workstation. R. at 1046.   ALJ Norris asked Burger, the VE, whether, taking into consideration the physical limitations posited by Dr. Smith and Dr. Hutson, an individual of Henderson's age, education, and work experience could perform any jobs.   R. at 1049.   Burger testified that such an individual could perform the unskilled, sedentary jobs of office clerk (3,441 in Indiana), cashier (3,226 in Indiana), and assembler (4,237 in Indiana).   R. at 1050.   Burger affirmed that his testimony was consistent with the information contained in the Dictionary of Occupational Titles.   *Id.*

ALJ Norris found that Henderson was not disabled in a March 23, 2007, decision. R. at 708-25.   ALJ Norris' decision became the final decision of the Commissioner when the Appeals Council denied review.   R. at 684.   Pursuant to 42 U.S.C. § 405(g), Henderson filed this civil action for judicial review of the Commissioner's final decision.   On May 28, 2008, the Court consolidated Henderson's cases to reflect ALJ Norris' consolidation of both of Henderson's applications.   Dkt. No. 5.

## II. DISABILITY AND STANDARD OF REVIEW

To be eligible for SSI and DIB, a claimant must have a disability under 42 U.S.C. § 423.   "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423 (d)(1)(A).   In determining whether a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1.  If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2.  If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3.  If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4.  If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5.  If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, then it shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. §405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner. *See, e.g.*, *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.* While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to

23

support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz*, 55 F.3d at 307. An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence." *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

### III. <u>DISCUSSION</u>

### A. THE ALJ'S FINDINGS

ALJ Norris first noted that Henderson met the disability insured status requirements on her alleged onset date and that she continued to satisfy them through December 31, 2003. R. at 714. At the first step of the disability analysis, ALJ Norris found that there was no evidence that Henderson engaged in substantial gainful activity after her alleged onset date. *Id.* Next, ALJ Norris determined that Henderson has severe impairments, namely degenerative disc disease, Grave's disease, hypertension, and asthma. *Id.* In addition, ALJ Norris noted that Henderson has hand problems and migraine headaches, which he determined were non-severe impairments. *Id.* At the third step, ALJ Norris found that the record failed to establish the existence of an impairment or combination of impairments that

24

medically equaled an impairment specified in the Listing of Impairments. R. at 715. Between the third and fourth steps, ALJ Norris determined that Henderson had the RFC to perform the physical exertion and non-exertional requirements of sedentary work with some limitations. *Id.* He determined that Henderson was limited to lifting no more than ten pounds at a time. *Id.* He also determined that she could sit for six hours and walk and stand for two hours during an eight hour work day. *Id.* Further, ALJ Norris determined that Henderson must avoid climbing ladders, ropes, or scaffolds and also must avoid concentrated exposure to cold, dusts, fumes, or gases. *Id.* At step four of the sequential analysis, ALJ Norris found that Henderson was unable to perform any of her past relevant work. R. at 724. Lastly, at step five, ALJ Norris determined there were a significant number of jobs in the national economy that Henderson could perform, and thus ALJ Norris found that Newhart was not disabled. R. at 21.

### B. HENDERSON'S ARGUMENTS ON APPEAL

Henderson makes several arguments on appeal. First, Henderson argues that ALJ Norris did not properly assess her credibility within the framework of Social Security Ruling ("SSR") 96-7p. Specifically, Henderson asserts that ALJ Norris improperly assessed her ADL when he required objective verification to support her allegations, manufactured an inconsistency in her testimony, improperly considered the side effects she experiences from Vicodin, and misrepresented the record evidence to discredit Henderson's allegations of pain. Second, Henderson argues that Dr. Hutson improperly discredited her neurological symptoms, namely numbness, tingling, and weakness, as those symptoms pertain to spinal stenosis. Lastly, Henderson argues that ALJ Norris improperly evaluated her migraine headaches. The Court considers each of Henderson's arguments in turn.

25

### 1. **ALJ Norris' Credibility Assessment**

Henderson argues that ALJ Norris did not properly assess her credibility under SSR 96-7p. "When the existence of a medically determinable physical . . . impairment that could reasonably be expected to produce the symptoms has been established," the ALJ must evaluate the "intensity, persistence, and functionally limiting effects of the symptoms" to "determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 96-7p. "This requires the [ALJ] to make a finding about the credibility of the individual's statements" regarding the symptoms and their functional effects. *Id.* "Because the ALJ is in the best position to observe witnesses, [the Court] will not disturb his credibility determinations as long as they find some support in the record." *Schmidt*, 496 F.3d at 843 (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1178-79 (7th Cir. 2001)). As such, the Court "will reverse an ALJ's credibility determination only if the claimant can show it was patently wrong." *Id.* (quoting *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003)) (internal citations omitted).

Henderson submits that ALJ Norris improperly required objective verification to support her allegations of disabling pain. In his decision, ALJ Norris concluded that Henderson's testimony regarding her ADL was only partially credible, because the record revealed that she was more active than she claimed to be at her 2005 hearing. R. at 718, 721, 723. Thus, in the context of ALJ Norris' decision, the "objective" evidence that he found lacking merely reflected his observation that Henderson's testimony at her 2005 hearing was not consistent with her prior representations to treating physicians. R. at 718, 721, 723. ALJ Norris did not, as Henderson seems to assert, require objective medical evidence to support Henderson's testimony regarding her ADL. R. at 718, 721, 723.

26

Rather, in the context of Henderson's testimony regarding her ADL, ALJ Norris merely made a credibility determination, which was well within his capacity as an ALJ.  SSR 96-7p. Accordingly, the Court concludes that ALJ Norris properly assessed Henderson's credibility under SSR 96-7p.

Henderson also argues that ALJ Norris manufactured an inconsistency in her testimony when he stated in his decision that Henderson "testified that she does nothing all day . . . ."  R. at 717, 721.  According to Henderson, this statement misrepresents the testimony she gave at her 2005 hearing.  However, at her hearing, Henderson testified that she does not cook, clean, shop for groceries, drive herself, or go up or down stairs.  R. at 1016-18.  In addition, Henderson testified that she develops migraine headaches "two days a week" for which she takes medication.  R. at 1025.  According to Henderson, after she takes the medication, she spends the whole day in the dark.  *Id.*  Therefore, the general thrust of Henderson's testimony at her 2005 hearing supports ALJ Norris' statement that Henderson "testified that she does nothing all day . . . ."  R. at 717, 721.  Accordingly, the Court concludes that ALJ Norris properly assessed the credibility of this testimony when he evaluated it against the record evidence that establishes Henderson was engaged in a variety of physical activities.  R. at 721; s*ee Dixon*, 270 F.3d at 1178-79.

Next, Henderson argues that ALJ Norris incorrectly considered the side effects she experienced from taking Vicodin, namely sleepiness and drowsiness.  Again, the Court disagrees.  There is no indication that ALJ Norris found Henderson's testimony regarding the side effects she experienced from Vicodin completely incredible.  R. at 721.  Rather, ALJ Norris noted that Henderson testified Vicodin made her drowsy, but concluded that the drowsiness Henderson experienced is not "significantly limiting."  *Id.*  Henderson does not

direct the Court to any portion of her testimony that specifically contradicts ALJ Norris'

analysis.  R. at 1010-11.  In his decision, ALJ Norris cited record evidence that indicated

Henderson was completely unable to take Valium due to its side effects.  *Id.*  However,

Henderson does not direct the Court to any record evidence that establishes a similar

inability to consume Vicodin because of its disabling impact.  In addition, ALJ Norris noted

record evidence that indicated Vicodin relieved Henderson's pain.  R. at 719, 856.  Thus,

it was logical for ALJ Norris to conclude that Vicodin increased Henderson's functional

ability.  R. at 721.  Altogether, the Court concludes that ALJ Norris properly articulated his

evaluation of Henderson's credibility when considering Henderson's 2005 testimony that

Vicodin made her drowsy.  SSR 96-7p; *see Dixon*, 270 F.3d at 1178-79.

Henderson also argues that ALJ Norris improperly discredited her complaints of

back pain by misrepresenting the record evidence.  Specifically, Henderson asserts that

ALJ Norris summarized the evidence in a way that implied that Henderson reported no

back problems after her February 2001 surgery until July 2004.  Henderson's Br. at 25

(citing R. at 721).  However, Henderson fails to direct the Court to any statement in ALJ

Norris' decision where he (1) explicitly misstated the evidence of record to (2) support his

finding that Joyce's 2005 testimony was not completely credible.  R. at 718, 723.  On the

contrary, as Henderson acknowledges in her brief, ALJ Norris found that Henderson's

actual ADL (as determined by ALJ Norris) and Henderson's pain reports were consistent

with one another.  *Compare* Henderson's Br. at 21, *with* R. at 721.  Thus, it is apparent that

ALJ Norris gave Henderson's subjective allegations of pain considerable weight in

assessing her RFC at the least strenuous level of exertion.  SSR 96-7p.  Furthermore, ALJ

Norris recited specific examples in the record to support his conclusion that Henderson's

allegations of completely disabling pain were only partially credible.  R. at 716-723.

Altogether, in the context of Henderson's 2005 testimony, the Court concludes that ALJ

Norris properly considered the record evidence to support his credibility determination.

SSR 96-7p; *see Dixon*, 270 F.3d at 1178-79.

## 2. <u>Henderson's Neurological Symptoms</u>

Second, Henderson argues that Dr. Hutson improperly discredited Henderson's

neurological symptoms, namely numbness, tingling, and weakness, as those symptoms

pertain to spinal stenosis.  The Court is not in a position to dissect Dr. Hutson's testimony

at Henderson's 2005 hearing.  *Nelson*, 131 F.3d at 1234.  Rather, the question before the

Court is whether ALJ Norris' findings are supported by substantial evidence.  *Id.*  At step

two of the disability analysis, ALJ Norris did not find that Henderson had spinal stenosis.

R. at 714.  Rather, ALJ Norris found that Henderson had degenerative disc disease.  *Id.*

Regardless of the specific spinal disorder ALJ Norris evaluated, the issue before ALJ Norris

at step three was whether Henderson's impairments met or equaled Listing 1.04, which

covers both spinal stenosis and degenerative disc disease.  20 C.F.R. Part 404, Subpart

P, Appendix 1.

It is apparent from his decision that ALJ Norris considered Listing 1.04(C), which

specifically covers spinal stenosis as well as the entirety of Listing 1.04.  R. at 715-16, 720.

For instance, ALJ Norris relied on Dr. Hutson's testimony that Henderson's March 2005

MRI findings did not meet or equal Listing 1.04(C), because she did not demonstrate the

appropriate loss of neurological functions.  R. at 715-16, 1047.  ALJ Norris also reviewed

the record evidence, which supports Dr. Hutson's testimony.  R. at 715-16, 720.

Specifically, ALJ Norris noted that prior examinations did not reveal that Henderson's spinal

cord or nerve roots were impinged.  R. at 715 (citing Exs. 8F at 2; 10F at 2, 4, 5; 15F at 3, 4; B46F at 5; B47F at 3; B at 4).  Further, ALJ Norris noted that Henderson's physicians have not found that she is unable to effectively ambulate.  R. at 715-16 (citing Exs. I at 5, 6; 10F at 1; A at 2).  On the contrary, Henderson has demonstrated almost normal strength her extremities.  R. at 720 (citing Exs. I at 6; J at 1).  These are the appropriate considerations under Listing 1.04(C), not whether Henderson experienced numbness and tingling.  Since Henderson does not draw the Court's attention to any other subsection of Listing 1.04 that she arguably meets or equals, the Court concludes that ALJ Norris' finding that Henderson did not meet or equal Listing 1.04 is supported by substantial evidence.

### 3. Henderson's Migraine Headaches

Lastly, Henderson argues that ALJ Norris improperly evaluated her migraine headaches.  Specifically, Henderson asserts that ALJ Norris erroneously relied upon the absence of objective medical evidence to discount Henderson's testimony of experiencing migraine headaches.  However, under SSR 96-3p, an impairment that manifests itself in symptoms, such as vomiting, nausea, pain, and fatigue, will not be considered "severe" unless objective medical evidence establishes a medically determinable physical or mental impairment.  Thus, in finding that Henderson's migraine headaches were not "severe," it was not error for ALJ Norris to note that the record medical evidence failed to establish any lesions on Henderson's brain that could account for her migraine headaches.  R. at 715 (citing Ex. B at 14).

However, even when an ALJ determines that an impairment is not "severe" at step two, he must still consider all of a claimant's impairments at steps four and five when determining a claimant's functional RFC and the ability to meet the demands of work.

30

*Brummet v. Barnhart*, No. 1:05-cv-00581, 2006 WL 3248452, at *8 (S.D. Ind. June 13, 2006) (Hamilton, J.) ("As long as the ALJ proceeds beyond step two, . . . no error could result solely from his failure to recognize an impairment as "severe."). On that note, Henderson asserts that ALJ Norris erred in finding Henderson's migraines did not occur with sufficient frequency or severity to result in any work limitations. In support thereof, Henderson argues that ALJ Norris ignored her prior reports to the Commissioner and her treating physicians about the frequency with which she experienced migraine headaches. Henderson's Br. at 33-34 (citing R. at 112, 117, 127, 148, 373, 595, 658, 660, 662, 677, 373, 793, 796, 816, 861, 931, 933-34, 1025). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson*, 999 F.2d at 181. However, "[w]hen the ALJ fails to mention an entire line of evidence in his decision, [the Court is] unable to conduct a meaningful review[.]" *Herron*, 19 F.3d at 337. In this case, it appears that the record evidence regarding the frequency, duration, and disabling impact of Henderson's migraine headaches was not considered by ALJ Norris. R. at 714-15.

At her 2005 hearing, Henderson testified that approximately two times a week she develops migraine headaches that force her to spend the whole day lying down in complete darkness. R. at 1025. Dr. Smith testified that there is "nothing in the records about the severity of how often and how long [Henderson's migraine headaches] last[.]" R. at 1035. As Henderson points out in her brief, Dr. Smith's testimony was inaccurate. R. at 112, 117, 127, 148, 373, 595, 658, 660, 662, 677, 373, 793, 796, 816, 861, 931, 933-34, 1025. It appears that ALJ Norris relied solely on Dr. Smith's testimony when he concluded that Henderson's "headaches do not occur with the frequency or severity which would result in any work related limitations and this condition is not a 'severe' impairment." R. at 715.

Regarding steps four and five of the disability analysis, ALJ Norris did not include information regarding the frequency, duration, and disabling impact of Henderson's migraine headaches in his hypothetical question to the VE.  R. at 1049-50; *see Brummet*, 2006 WL 324852, at *9.  He also failed to account for this information in his determination of Henderson's RFC.  R. at 716-724; *see Brummet*, 2006 WL 324852, at *9.  Although ALJ Norris found that Henderson's testimony about her limitations was not entirely credible, he did not specifically address her testimony regarding the frequency, duration, and disabling impact of her migraine headaches, other than to point out she testified she suffers from migraine headaches that totally incapacitate her on the average of two days each week.  R. at 717.  Accordingly, ALJ Norris' decision does not reflect that he considered the record evidence Henderson cites in her brief when finding Henderson's migraines were not completely disabling.  R. at 714-15 (citing Ex. A at 29; Ex. B at 7, 14).  For this reason alone, ALJ Norris' decision must be **REMANDED** for further consideration.  *Golembiewski v. Barnhart*, 322 F.3d 912, 916-18 (7th Cir. 2003).


## IV. <u>CONCLUSION</u>

For the reasons stated herein, this case is **REMANDED** for further proceedings consistent with this entry.

IT IS SO ORDERED this 23rd day of February, 2010.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution to:

Marcia J. Cossell
LEE COSSELL KUEHN & LOVE LLP
mcossell@nleelaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov